IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No. 05-cv-00993-LTB-CBS

SOOTHSOFT INNOVATIONS WORLDWIDE, INC. f/k/a MAVERICK MARKETING VENTURES, INC.; ERIC D. STANLEY; and KIRK A. STANLEY,

    Plaintiffs,

v.

K&H MANUFACTURING, INC.; PETSMART, INC.; DRS. FOSTER & SMITH, INC.; PET STREET MALL d/b/a THEPAMPEREDPETMART.COM; EBAY, INC.; FAITHFUL PET PRODUCTS; MANITOU MARKETING, INC. d/b/a TOTALPETCOMFORT.COM; JEFFERS PET d/b/a JEFFERSPET.COM; DRESSLER'S DOG SUPPLIES d/b/a DRESSLERSDOG.COM; J-B WHOLESALE PET SUPPLIES, INC. d/b/a JBPET.COM; LAMBRIAR ANIMAL HEALTH CARE, INC. d/b/a LAMBRIARVET.COM; PICKLED HERRING, INC. d/b/a PETRONIC.COM; A S WEBSALES CORPORATION d/b/a BUYPETBEDS.COM; and CARE-A-LOT PET SUPPLY d/b/a CAREALOTPETS.COM,

    Defendants.

_____

ORDER
_____

    Eric and Kirk Stanley (the "Stanleys"), brothers who founded and currently operate SoothSoft Innovations Worldwide, Inc. ("SoothSoft"), have with SoothSoft initiated this lawsuit and now move for a preliminary injunction prohibiting K&H Manufacturing, Inc. ("K&H") from manufacturing and selling an allegedly infringing product. In addition to the parties' helpful briefs, I have the benefit of the evidence and oral arguments that the parties presented in a full-day hearing on July 21, 2005. For the reasons stated below, I GRANT the plaintiffs' motion.

### I. Findings of fact

    I find the following facts from the credible testimony adduced at the evidentiary hearing.

The Stanleys own United States Patent No. 5,991,948 ("'948 Patent"), under which

SoothSoft by license from the Stanleys manufactures and sells a product known as the "Canine Cooler" pet bed.  The invention personified by the Canine Cooler is described in claim one of the '948 Patent, which reads,

> A thermal regulating cushioning device comprising:
>
> a flexible, deformable outer membrane being adapted to sealably receive a liquid material therein;
>
> a foam core being encased, within and in intimate contact with, but not bonded to, said flexible, deformable outer membrane wherein said foam core has a dimension substantially coincident with said outer membrane;
>
> a liquid material being sealably contained within said flexible, deformable outer membrane and saturating said foam core, said liquid material being at least partially circulatable through said foam core wherein the cooperation of said saturated foam core and said sealable flexible membrane provide a substantially uniform, thermal regulating medium and structural support such that said cushioning device is readily, uniformly deformable when a load is applied thereto.

In 1994, the Stanleys, then resident in Maine, developed the technology that would later yield the Canine Cooler.  The innovation is achieved when a foam core is encased within a sealed, vinyl membrane by a process called radio frequency welding.  The membrane, which forms an envelope around the foam core, is filled with water and the core is soaked through.  Thus soaked, the foam core rests within and in contact with the membrane, dissipating heat from and providing a soft, deformable support to bodies placed on the device.

The Stanleys first marketed their innovation as a pillow for humans, which they called the "Chillow."  They made the first Chillows by hand and friends with business experience assisted them with marketing.  After discovering that a friend's dog liked to recline on a Chillow, the Stanleys began manufacturing and marketing the product that became the Canine Cooler.  The business grew slowly at first.  The Stanleys hired their first employee in 1995.

Their break came in 1997, when *Dog Fancy Magazine* acknowledged the Canine Cooler as the most innovative product of that year. Thereafter, business increased markedly. The Stanleys, committed to production of their products in the United States, found manufacturers capable of performing radio frequency welding in Maine and, when the business later expanded further, Indiana. Later, the Stanleys moved to Colorado and operated their business out of houses and residential garages. Eventually, they subleased a space from a package supplier.

Because the Stanleys' business, SoothSoft, depends for its survival on the commercial success of the Chillow and the Canine Cooler, the Stanleys have spent approximately $450,000 to protect their intellectual property. They retained Lee Meyer, a patent attorney of considerable experience, to prosecute their various patents. Mr. Meyer encountered resistance from the patent examiner at the United States Patent and Trademark Office ("USPTO") when he first submitted the application for the '948 Patent. As first submitted, claim one read,

> A thermal regulating cushioning device comprising:
>
> a flexible, deformable outer membrane being adapted to sealably receive a liquid-like material therein;
>
> a foam core being disposed within said flexible, deformable outer membrane wherein said foam core has a dimension substantially coincident with said outer membrane;
>
> a liquid-like material being sealably contained within said flexible, deformable outer membrane and saturating said foam core, said liquid-like material being at least partially circulatable through said foam core wherein the cooperation of said saturated foam core and said sealable flexible membrane provide a substantially uniform, thermal regulating medium and structural support such that said cushioning device is readily, uniformly deformable when a load is applied thereto.

The patent examiner rejected the claim, citing three patents that appeared to anticipate it: United States Patent No. 3,872,525 ("Lea Patent"); United States Patent No. 3,600,726 ("Williams Patent"); and United States Patent No. 3,574,873 ("Weinstein Patent"). Each of

these earlier patents teaches a foam core encapsulated within a flexible envelope. However, claim one of the '948 Patent, as amended, ultimately proved distinguishable from all of them.

The Williams Patent teaches a pad comprised of a membrane containing a foam core, water, and air. Mr. Meyer characterizes this device as an air mattress. The Stanleys' device, by contrast, contains virtually no air. Instead, the foam core, saturated with water, supports the outer membrane directly. Introduction of air into the membrane would eliminate the thermal regulating and structural support qualities of the Stanleys' device. To convey this distinction, Mr. Meyer amended claim one to state that the foam core was "in intimate contact with" the outer membrane.

The Lea and Weinstein Patents teach cushioning devices comprised of foam cores adhered to outer membranes or envelopes at various points or thoroughly over their communicating surfaces. In each instance, the bond between the core and the membrane prevents slippage between the components and places shear forces on a body that is laid on the surface of the device. The Weinstein Patent describes the shear force as

> the lateral distortion of skin and subcutaneous tissues which takes place when the supporting surface does not move jointly with, and in response to, lateral movement of the body being supported, the skin and tissues being restrained by frictional resistance between the skin, or the person's clothing, and supporting surface.

Weinstein Patent, col. 1, lines 38-43. Weinstein attempted to avoid the shear forces by making the cover of the supporting device slippery. Lea also placed shear forces on bodies laid on the device because "[t]he foam [core] is bonded to the inside of the envelope to form the pad; thus when pressurized fluid is trapped inside the pad the foam is placed in tension and the shape of the foam determines the shape of the pad." Lea Patent, col. 1, lines 45-48.

By contrast, the '948 Patent and the Canine Cooler allows slippage between the

4

membrane and the core, because the core is contained within but not adhered to the membrane. It thus avoids the shear forces inherent in the Lea and Weinstein devices; the membrane moves with a body placed on it, independent of the core. To convey this distinction, Mr. Meyer amended claim one to state that the foam core of the Stanley device was "not bonded to" the outer membrane. With Mr. Meyer's amendments to claim one, the USPTO approved the '948 Patent on November 30, 1999.

K&H alleges that United States Patent No. 4,259,961 ("'961 Patent") anticipated the '948 Patent, rendering the '948 Patent invalid. Mr. Meyer testified that during his prosecution of patent rights for the Stanley's innovation in the United States, the European Union, Japan, Mexico, Brazil, South Africa, South Korea, and Australia no patent examiner has cited the '961 Patent to him as potentially anticipating claim one of the '948 Patent. (In all but Japan, where the application is pending, the patent has been approved.) The '961 Patent teaches a cooling device for maintaining low organ metabolism that is comprised of a pair of flexible walls, sealed together at their edges except at an inlet and outlet disposed away from each other, enclosing a foam filler and employing an external pump and heat exchanger. Fluid flows through the pad by way of the pump and heat exchanger. The external components induce a flow of fluid through the pad that causes a negative pressure (a vacuum) within the pad when the device is in operation. As a result, the pad collapses, wrapping itself around a body placed on it.

Mr. Meyer explained that, though a negative pressure can exist within the Canine Cooler when filled, the Canine Cooler is designed to provide support to, not wrap around, a body placed on it and that any negative pressure is not externally induced but rather static once the device is filled and capped. Unlike the Stanley's invention, the device described in the '961 Patent is not

a cushioning device but rather a thermal wrap, does not provide structural support to bodies placed on it, does not deform uniformly, does not seal fluid within itself, and acts rigidly rather than flexibly.  Also unlike the Canine Cooler, the device described in the '961 Patent involves components external to the cooling pad.  Mr. Meyer testified that the USPTO had rejected his attempt to include in the '948 Patent a claim for a device with inlets, outlets, and external components; the patent examiner reasoned that such a device would constitute a patentably distinct invention.  Mr. Meyer later successfully prosecuted a separate patent for that device, United States Patent No. 6,128,795 ("'795 Patent").  K&H did not rebut Mr. Meyer's credible testimony on these matters.

In 2003, in response to growing demand for its products, SoothSoft purchased $50,000 worth of capital assets, including software, computer hardware, a forklift, a truck and trailer, and expanded its payroll from five employees to 20.  It moved into a 14,400 square-foot space in Colorado Springs.  It marketed the Chillow and the Canine Cooler through catalogues, internet sellers, wholesalers, retailers, and directly to consumers through its own web site.  Though SoothSoft paid for some of these expenditures in cash, it financed others and continues to service the resulting debt.  The investment proved well-advised.  SoothSoft's gross sales increased from $499,471.13 in 2001 to $845,783.30 in 2002 and $890,263.69 in 2003.  In the first six months of 2004, SoothSoft enjoyed gross sales of $716,924.16.

SoothSoft owns the registered trademark "Canine Cooler" and uses the phrase on its packaging and in its marketing materials.  It also utilizes a photograph of a Bernese Mountain Dog reclining on a Canine Cooler.  Trademark registration for that image is pending.  While the name "Canine Cooler" features prominently on all of SoothSoft's packaging and marketing

materials, the image of the Bernese Mountain Dog does not.  In fact, Eric Stanley testified that six different breeds of dogs have appeared with the Canine Cooler product in corporate-sponsored images over the past several years.  A box in which SoothSoft packaged a Canine Cooler for small dogs from April, 2004 until March 2005 contains twelve images of four different breeds of dogs and does not bear the Bernese Mountain Dog image.  A more recent iteration of that package employs the Bernese Mountain Dog image on one end flap among the various other images.  Other SoothSoft packages, fliers, and advertisements feature the Bernese Mountain Dog more prominently.  In particular, the image largely consumes a point-of-purchase sign that SoothSoft provides to retailers for display with the Canine Cooler.  Canine Cooler packaging utilizes a blue or white background.

   In the summer of 2004, James Koskey, the President of K&H, began to develop a product to compete with the Canine Cooler.  K&H called its product the "Cool Bed."  Like the Canine Cooler, the Cool Bed consists of a foam core encased within a vinyl membrane.  When filled with water as intended the Cool Bed performs in substantially the same manner as the Canine Cooler.  Two differences are noteworthy.  First, the membrane of the Cool Bed, which is dyed a different color than that of the Canine Cooler, is constructed of a thinner material.  Second, the foam core is tied to the interior of the membrane along two edges by two ribbons, which run parallel to and between the exterior edges of the core and interior edges of the membrane and are inserted into the core on one side and welded into the seam of the membrane on the other.

   Mr. Meyer, after examining the Cool Bed, testified that it exhibits the same traits as the Canine Cooler.  As in the Canine Cooler, the membrane and core of the Cool Bed move independently of each other because they are not, in Mr. Meyer's words, "bonded to" each other.

Mr. Meyer explained that the ribbon that ties two sides of the core to the membrane within the Cool Bed does not produce the shear forces that can be found in the Lea and Weinstein devices. And unlike the Williams device, the Cool Bed does not contain air that lifts the membrane off the core; the core and the membrane of the Cool Bed are in intimate contact with each other.

Before marketing the Cool Bed, Mr. Koskey solicited from a patent attorney, Dale Halling, an opinion whether four Stanley patents, including the '948 and '975 Patents, read on the Cool Bed. Mr. Halling wrote his opinion in letter form on June 30, 2004 ("Halling Letter"). Although the opening sentence suggests that Mr. Koskey was trying to determine "how to design a water bed style dog mat," other references within the letter to Mr. Koskey's "present design" make clear that Mr. Koskey had the specific design for the Cool Bed already in mind. The Halling Letter contains the caveat, "This opinion should not be considered a full-blown clearance opinion with respect to any of these patents." Mr. Koskey never obtained a full-blown opinion because the cost was prohibitive.

The Stanley patents, including claim one of the '948 Patent, are distinguished in the Halling Letter on the ground that Mr. Koskey's design for the Cool Bed "has the foam core bonded to the outer membrane." However, derivatives of the word "bond" are assigned inconsistent definitions in the Halling Letter. In several places the phrase "bonded to" is employed to describe the relationship between the foam core, the ribbons, and the membrane of the Cool Bed. On page three, in a section noting "Other Patents of Interest," the phrase "bond... to" is used as a synonym for "adhered to" and describes the work of an adhesive. The equivalence between "adhered to" and "bonded to" is repeated in the conclusion of the Halling Letter, in which Mr. Halling nevertheless opined that Mr. Koskey's "present design does not

appear to literally infringe any of the four Stanley patents."

K&H in its marketing efforts employs a prominent image of a Bernese Mountain Dog reclining on a Cool Bed. The packaging for K&H's medium-sized Cool Bed contains four copies of this image and no other. Ken Weaver, who designed K&H's packaging, testified that the choice of the Bernese Mountain Dog was random and not a result of SoothSoft's use of the same breed. The packaging features a blend of blue and white background, the two colors fading into each other where they meet. This fade effect is found on the packaging for other K&H products, though the colors vary.

Until recently, K&H had also strategically used the phrase "canine cooler" on its web site in an effort to attract people searching for SoothSoft's product. K&H put the words "canine" and "cooler" in the meta tags of its web site, which attract search engines. Also, as late as May, 2005, K&H maintained on its site the sentence, "The perfect place for keeping your canine cooler year-round." The title for the Cool Bed page read, "Cool Bed - Keep your canine cooler year-round." Mr. Koskey admitted that use of that particular phraseology was a deliberate attempt to mislead potential customers of SoothSoft. (Incidentally, this admission belies Mr. Koskey's claim that K&H desires not to have its product associated with SoothSoft's, an assertion that I do not find credible anyway.) K&H removed the offending phrases after SoothSoft served this lawsuit upon it.

Kirk Stanley identified several instances of which he was aware in which retailers confused the Canine Cooler with the Cool Bed. On one occasion he saw Canine Coolers and Cool Beds stacked together in a Cool Bed display case. Several retailers and web sellers have included images of Canine Coolers and Cool Beds together or overlapping, with nothing to

9

distinguish between the two.  While the Bernese Mountain Dog appears in each of the Cool Bed images, other breeds appear with the Canine Cooler.  Some sellers portray the Canine Cooler and Cool Bed as different color schemes of the same product.  On one web site, an image of which was introduced into evidence, a seller was offering a "New K&H canine cooler," which product, of course, does not exist.

K&H manufactures the Cool Bed in China and is able to sell the Cool Bed for less than the price of the Canine Cooler.  Introduction of the Cool Bed into the market late in 2004 corresponded with an immediate decline in SoothSoft's sales of the Canine Cooler.  SoothSoft's gross sales plummeted from $716,924.16 in the first half of 2004 to $210,954.99 in the second half of that year and $248,760.81 in the first six months of 2005.  Kirk Stanley testified that SoothSoft cannot service its debt load and stay in business unless its sales return to the levels that preceded K&H's entry into the market.  Meanwhile, K&H has enjoyed in the first six months of 2005 gross sales of Cool Beds between $500,000 and $600,000, providing approximately $250,000 in net profits.  Cool Beds account for 10% of K&H's total sales.

## II. Conclusions of law

The plaintiffs move for a preliminary injunction on two grounds.  First, they argue that the Cool Bed literally infringes claim one of the '948 Patent.  Second, they argue that K&H is infringing SoothSoft's trademarks.  Because I find and conclude that the plaintiffs are reasonably likely to succeed on their patent infringement claims, I need not consider the trademark claims.

The law of the Federal Circuit governs requests for preliminary injunctions to enjoin alleged patent infringement.  *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988); *McData Corp. v. Brocade Communications Systems, Inc.*, 233 F. Supp. 2d

1315, 1319 (D. Colo. 2002). The plaintiffs must demonstrate: (1) a reasonable likelihood of their success on the merits; (2) that they would suffer irreparable harm if the injunction were not granted; (3) that the balance of the hardships weighs in their favor and (4) the impact of the injunction on the public interest. *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).

**A.     Likelihood of success on the merits**

In order to demonstrate a likelihood that they will succeed on the merits of their patent claims, the plaintiffs must show that (1) they will likely prove infringement and (2) their infringement claim will likely withstand K&H's challenges to the validity and enforceability of the '948 Patent. *Purdue Pharma*, 237 F.3d at 1363. If K&H defends with evidence raising a substantial question concerning validity, enforceability, or infringement, the plaintiffs are required to produce countervailing evidence demonstrating that these defenses lack substantial merit. *Id*.

**1.     Infringement**

In order to discern whether K&H has infringed the '948 Patent, I must first determine the meaning and scope of claim one and then compare claim one to the Cool Bed. *Ibid*; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd* 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). K&H argues that the foam core of the Cool Bed is "bonded to" the membrane and that the Cool Bed thus avoids infringement. (At oral argument counsel for K&H also speculated that air might become trapped within the membrane once filled with water, thus preventing the foam core from being "in intimate contact with" the membrane, as claim one requires. However, no evidence of that imagined scenario appeared and I have no reason to

11

believe that the Cool Bed might be distinguished from claim one on that basis.)  I am left to determine the definition of the phrase "not bonded to" and to ascertain whether the Cool Bed fits that definition.

In interpreting a patent's claims, I first look to the intrinsic evidence of record, including the claims of the patent, the written description, and the prosecution history.  *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 870 (Fed. Cir. 1998); *CIVIX-DDI, LLC v. Microsoft Corp.*, 84 F. Supp. 2d 1132, 1138 (D. Colo. 2000), *aff'd* 18 Fed. Appx. 892 (Fed. Cir., 2001).  Such evidence, which alone the parties have produced, is "the most significant source of the legally operative meaning of disputed claim language."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The parties stipulated that expert testimony by one skilled in the relevant art is unnecessary to construe the phrase in question.

The parties have offered two competing, ordinary meanings of the phrase "bonded to." *Gentex Corp. v. Donnelly Corp.*, 69 F.3d 527 (Fed. Cir. 1995).  The plaintiffs suggest that the phrase means that all or substantially all points of contact between the foam core and the outer membrane are adhered together.  They have in mind a particular function for the bond, namely that it prevents the core and the membrane of the pad from moving independently of each other. K&H suggests that a bond may include a fetter, cord, or band that ties two objects together; in its construction, any permanent communication between the core and the membrane will remove the otherwise-infringing device from the purview of the claim.

Mr. Meyer testified credibly that he added to claim one the phrase "not bonded to" in order to distinguish the Lea and Weinstein Patents, which the patent examiner cited as anticipatory art. By the phrase he meant to convey that the membrane and core of the pad move

independently of each other, alleviating the shear forces that obtain in devices in which the core and membrane are adhered together either entirely over their communicating surface or at several points of contact. The Lea and Weinstein Patents, references to which appear in the prosecution history of the '948 Patent, support Mr. Meyer's testimony.

From this evidence, I find and conclude that Mr. Meyer's use of the phrase "not bonded to" constituted a successful attempt to distinguish the art of the Lea and Weinstein Patents. For that reason, the best definition of "bonded to" can be found in the language quoted from the Lea patent, which teaches a foam core "bonded to the inside of the envelope" such that "when pressurized fluid is trapped inside the pad the foam is placed in tension and the shape of the foam determines the shape of the pad." Lea Patent, col. 1, lines 45-48.

I note that the Halling Letter further undermines K&H's interpretation of the phrase. K&H's own patent counsel interpreted the term "bonded" to mean "adhered." Mr. Halling's use of the term "bonded" was inconsistent at best, and in two instances was contrary to the interpretation for which K&H advocates here. If Mr. Halling had an understanding of the definition of the phrase "bonded to," as that term is found in claim one of the '948 Patent, that understanding was at least partially consistent with that of the plaintiffs.

K&H's understanding of the phrase "bonded to" thus admits of self-doubt. Mr. Koskey exhibited that doubt when he sought Mr. Halling's advice concerning the implications of the '948 Patent for his intended project. He anticipated at least the possibility that the Cool Bed infringed claim one. He should have anticipated that his now-proffered definition of "bonded to" would render the limitation superfluous; any potential infringer could escape liability merely by tying a string, cord, or ribbon between the core and membrane of its infringing product. That

Mr. Koskey might have been innocent of that scheme, as he maintains, will not relieve K&H of liability for any infringement.

I find and conclude from the evidence adduced that the Cool Bed likely infringes claim one of the '948 Patent as I have construed it. To establish literal infringement the plaintiffs must demonstrate that every limitation set forth in claim one is found in the Cool Bed, exactly. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir.1995). All aspects of the Cool Bed, except the ribbons, are found exactly in claim one. Unlike the adhesives used in the Lea and Weinstein devices, the ribbons in the Cool Bed do not bind the foam core to the membrane such that the shape of the foam determines the shape of the pad. Rather, as described in claim one of the '948 Patent, the membrane and core of the Cool Bed move independently of each other. Because the ribbons do not constitute a bond within the meaning of claim one, the plaintiffs are substantially likely to prove that the Cool Bed infringes the '948 Patent.

### 2. Validity and enforceability

K&H next argues that the '948 Patent is invalid by virtue of anticipation. 35 U.S.C. § 102. It cites several similarities between the '948 Patent and the '961 Patent. However, the external components, inlets, and outlets of the '961 Patent all teach away from claim one of the '948 Patent. I find persuasive the patent examiner's rejection of Mr. Meyer's proposed inclusion of similar components within the '948 Patent on the ground that those components made the resulting device patentably distinct. The '948 Patent is unlikely to be invalidated for lack of novelty. *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir.2001).

K&H argues that, while the '961 Patent incorporated elements not found in the '948

Patent, it anticipated all the elements that are found there.  However, the innovation of the '948 Patent – a sealed membrane not bonded to but in intimate contact with a saturated foam core – resulted in several traits not found in the '961 Patent device.  For example, the Stanley device provides structural support to bodies laid upon it, cushions those bodies, and deforms uniformly.  Thus, not all of the elements and limitations of claim one of the '948 Patent are shown, arranged as in the claim, in the '961 Patent.  *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001).  K&H has failed to overcome the presumption that the '948 Patent is valid.  *See Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1313 (Fed. Cir. 2005).

**B.     Irreparable harm**

Because the plaintiffs have made a clear showing of their likely success on the merits they are entitled to a rebuttable presumption of irreparable harm.  *Purdue Pharma*, 237 F.3d at 1367; *Reebok Intern. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir.1994).  K&H introduced no evidence that money damages will adequately compensate the plaintiffs in the event that judgment is entered against it.  Specifically, K&H failed to rebut Kirk Stanley's testimony that, absent an injunction, SoothSoft will have to cease operations.  I find that testimony credible and conclude that the plaintiffs have satisfied this element of their showing.

**C.     Balance of hardships**

The Canine Cooler is one of SoothSoft's two products.  A nearly two-thirds reduction in SoothSoft's gross sales has attended K&H's entry into the market.  The Cool Bed provides approximately 10% of K&H's sales revenues.  For these reasons, I find and conclude that the balance of hardships weighs in SoothSoft's favor.

**D.     Public interest**

The plaintiffs point out, and K&H does not dispute, that patents are by nature affected with public interest. *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 598 (3d Cir. 1972).

Accordingly, it is ORDERED that

1) the plaintiffs' motion for a preliminary injunction is GRANTED;

2) bond is set at **$250,000.00** and may be increased if trial does not commence within a year from this date; and

3) K&H is enjoined from manufacturing, marketing, or selling its Cool Bed product.

Dated: July   28  , 2005, in Denver, Colorado.

BY THE COURT:

  s/Lewis T. Babcock
Lewis T. Babcock, Chief Judge
